
#7

1541

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* GREENTREE MEDICAL | ) | |
| CENTER, P.C., | ) | |
| | ) | Civil Action No. 13 - 0597 |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN INTERNATIONAL | ) | |
| BIOTECHNOLOGY, LLC and | ) | |
| JASON HOOVER, | ) | |
| | ) | |
| Defendants. | ) | |

**SEALED COMPLAINT**

Relator Greentree Medical Center, P.C., by and through undersigned counsel and pursuant to 31 U.S.C. § 3730(b), files under seal the following *qui tam* complaint in civil action, averring as follows:

1.     In or around the fall of 2012, defendants American International Biotechnology, LLC ("Defendant AiBiotech") and Jason Hoover ("Defendant Hoover") conspired to and did engage in a scheme to defraud consumers and providers of federally-funded healthcare services by, *inter alia*, submitting numerous fraudulent billings to Medicare.

2.     Relator Greentree Medical Center, P.C. ("Greentree Medical") came to know of Defendants' fraud through the accounts of employees and patients of Greentree Medical at its Lions Medical Center ("Lions") in Rices Landing, Pennsylvania.

3.      Specifically, Defendant Hoover, who was at all relevant times a sales representative acting on behalf of Defendant AiBiotech, approached Greentree Medical employee Matthew Burkett and asked him to recruit Lions' patients to participate in what Defendant Hoover represented to Mr. Burkett and to the patients would be a "free medical trial."

4.      Many of Lions' patients, a substantial number of whom receive healthcare benefits coverage from the federal government, ultimately took part in Defendants' purported "free" clinical trial.

5.      Those patients subsequently received "explanation of benefits" statements (EOBs) indicating that Defendants had charged to and received from the patients' healthcare insurers, including federally-funded healthcare programs, thousands of dollars per patient in connection with what Defendants had represented would be "free" services.

6.      As elaborated below, through this unlawful conduct Defendants conspired to and did present or cause to be presented to the United States government, including Medicare and TRICARE/CHAMPUS, and Defendants further conspired to and did make or use false records material to the United States' decision to reimburse, fraudulent claims for payment related to services as to which Defendants knew they had no lawful right to reimbursement.

7.      By virtue of this unlawful conduct, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B) and (C).

2

## PARTIES

8.      Relator Greentree Medical is a Pennsylvania professional corporation with its principal place of business in Greentree, Pennsylvania.

9.      Defendant American International Biotech, LLC is a private limited liability company that holds itself out as a provider "of world-class laboratory services" to "drug discovery and diagnostic development organizations" seeking "to bring new products to market." http://www.aibiotech.com/.

10.      Defendant AiBiotech maintains its principal place of business in Richmond, Virginia.

11.      Defendant Jason Hoover is an adult individual who, upon information and belief, resides in southwestern Pennsylvania.

## JURISDICTION AND VENUE

12.      This action is based upon Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331.

13.      To the best of Greentree Medical's knowledge, Defendants' unlawful conduct described in this complaint has not been disclosed to the public in any way or through any medium. *See* 31 U.S.C. § 3730(e).

14.      Notwithstanding any such public disclosure, the allegations herein are based upon Greentree Medical's direct and independent knowledge of Defendants' fraudulent practices giving rise to the violations described in this complaint. Greentree Medical's direct and independent knowledge is derived in substantial

3

part from its employees at Lions and their interactions with Defendants and with the Lions patients who fell prey to Defendants' fraudulent scheme. *See id.* § 3730(e)(4).

15.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because, as set forth below, a substantial portion of the fraud giving rise to this action occurred in the Western District of Pennsylvania.

## The Medicare Program

16.    Congress instituted the Medicare Program ("Medicare") in 1965 to pay for the costs of certain healthcare services provided to individuals of qualifying age or disability and to individuals suffering with end-stage renal disease ("Medicare beneficiaries"). 42 U.S.C. §§ 426, 426A.

17.    The United States government, specifically the Department of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Services (CMS), administers and supervises Medicare and is responsible for reimbursement of services rendered to Medicare beneficiaries. *See, e.g.*, 42 U.S.C. §§ 1395b-9, 1395u.

18.    Part B of the Medicare Program, 42 U.S.C. §§ 1395j – 1395w-5 ("Part B"), provides federally-funded "Supplementary Medical Insurance Benefits for Aged and Disabled" Medicare beneficiaries.

19.    As a matter of law, the federal government need not and shall not provide Medicare reimbursement "for any expenses incurred for items or services":

    a. that "are not reasonable and necessary for the diagnosis or treatment of illness or injury," 42 U.S.C. § 1395y(a)(1); and

4

b. for which no person, including the individual Medicare beneficiary to whom "such items or services" were furnished, has a "legal obligation to pay," *id.* § 1395y(a)(2).

20. The Secretary of HHS is responsible for articulating what healthcare goods and services are "reasonable and necessary." 42 U.S.C. § 1395ff(a).

21. Regarding diagnostic tests, the Secretary has determined, in relevant part, that no such test is "reasonable and necessary" unless it was ordered by a qualified healthcare professional who "furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

22. No Medicare reimbursement may be sought or obtained for services that do not qualify as "reasonable and necessary" under the foregoing standards. *See* 42 U.S.C. § 1395y; *see also* 42 C.F.R. § 410.32(d)(3) & (4).

23. Similarly, reimbursement is only available under Part B for the "reasonable costs," *see id.* § 1395l, of statutorily-defined "medical and other health services," *id.* § 1395k (cross-referencing 42 U.S.C. § 1395x ("Definitions")).

24. Reasonable costs, in turn, do not include costs "found to be unnecessary in the efficient delivery of needed health services." *Id.* § 1395x(v)(1)(A).

25. Reasonable costs also specifically exclude the costs of "items or services" furnished to Part B beneficiaries "in excess of or more expensive than the items or services determined to be necessary in the efficient delivery of needed health services." *Id.* § 1395x(v)(4).

26.    Additional requirements govern the actual submission of claims for payment to Medicare, 42 C.F.R. §§ 424.30-424.44, which must be filed "by the provider [or] supplier" making the claim to Medicare and, absent express waiver of the requirement by relevant CMS instructions, signed by that provider or supplier, *id.* § 424.33.

27.    In addition, a provider or supplier seeking payment from Medicare for services furnished to Part B beneficiaries cannot obtain Medicare reimbursement unless "[t]he Part B items and services" described in the claim were "ordered or referred by a physician or, when permitted, an eligible professional (as defined in [42 C.F.R.] § 424.506(a))." 42 C.F.R. § 424.507(a)(i).

28.    To obtain reimbursement for "medical and other health services" furnished to Part B beneficiaries, a provider must certify that the services in question "were medically necessary," and such certification "must be signed by a physician, nurse [practitioner], clinical nurse specialist, or physician assistant who has knowledge of the case." 42 C.F.R. § 424.24.

### The TRICARE/CHAMPUS Program

29.    The TRICARE program ("TRICARE") is a "managed healthcare program that is established by the Department of Defense under the authority of" 10 U.S.C. §§ 1071-1104, to provide "an improved and uniform program of medical and dental care for members and certain former members of" the United States uniformed services, "and for their dependents." 10 U.S.C. § 1071, *id.* § 1072(a)(7).

30.     The Civilian Health and Medical Program of the Uniformed Services

(CHAMPUS)[1] is a part of the TRICARE program, authorized under 10 U.S.C. §§

1079 and 1086, statutes that respectively provide for federal coverage of "medical

care for spouses and children," and "for certain members[ and] former members" of

the armed services and their dependents.

31.     TRICARE/CHAMPUS covers "[o]nly the following types of care":

1. Hospitalization.
2. Outpatient care.
3. Drugs.
4. Treatment of medical and surgical conditions.
5. Treatment of nervous, mental, and chronic conditions.
6. Treatment of contagious diseases.
7. Physical examinations, including eye examinations, and immunizations.
8. Maternity and infant care[ ] . . . .
9. Diagnostic tests and services, including laboratory and X-ray examinations.
10. Dental care.
11. Ambulance service and home calls when medically necessary.
12. Durable equipment, which may be provided on a loan basis.
13. Primary and preventive health care services for women . . . .
14. Preventive health care screening for colon or prostate cancer, at the intervals and using the screening methods prescribed under section 1074d(a)(2) of this title.
15. Prosthetic devices, as determined by the Secretary of Defense to be necessary because of significant conditions resulting from trauma, congenital anomalies, or disease.
16. A hearing aid, but only for a dependent of a member of the uniformed services on active duty and only if the dependent has a profound hearing loss, as determined under standards prescribed in regulations by the Secretary of Defense in consultation with the administering Secretaries.
17. Any rehabilitative therapy to improve, restore, or maintain function, or to minimize or prevent deterioration of function, of a patient when prescribed by a physician.

---

[1] For ease of reference and consistent with general statutory structure and common usage, these programs together are at times identified as "TRICARE/CHAMPUS."

10 U.S.C. § 1077(a); *see also id.* § 1076.

32.    TRICARE/CHAMPUS, "[a]s a restraint on excessive demands for medical and dental care under section 1076," requires that "charges" for outpatient care provided to covered beneficiaries "may not be more than such amounts, if any, as the Secretary of Defense may prescribe after consulting the other administering Secretaries and after a finding that such charges are necessary." *Id.* § 1078(b).

33.    Further, CHAMPUS payments are limited to those provided for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). Accordingly, no reimbursement may be obtained under CHAMPUS for "[s]ervices and supplies that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness," nor does CHAMPUS cover "diagnostic tests" other than cancer screenings "not related to a specific illness or injury or a definitive set of symptoms." *Id.* § 199.4(g)(1) & (2).

34.    As with Medicare, CHAMPUS does not reimburse providers for "[s]ervices or supplies for which the beneficiary or sponsor has no legal obligation to pay." *Id.* § 199.4(g)(11).

35.    In addition, CHAMPUS does not cover "[s]ervices and supplies provided as part of or under a scientific or medical study, grant, or research program." *Id.* § 199.4(g)(14).

36.    Nor will CHAMPUS provide reimbursement "without submission of an appropriate, complete, and properly executed claim form." 32 C.F.R. § 199.7(a)(2).

37.    CHAMPUS claim forms must, *inter alia*, be signed by both the beneficiary and the participating provider responsible for the services for which reimbursement is sought. *Id.* § 199.7(c)(1) & (2).

38.    All of the general "fraud and abuse" requirements for CHAMPUS articulated in 32 C.F.R. part 199 are equally applicable to TRICARE. 32 C.F.R. § 199.17(r).

## The False Claims Act

39.    The False Claims Act (FCA) provides, in relevant part, that "any person who":

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
> (C) conspires to commit a [substantive] violation of [31 U.S.C. § 3729(a),]
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the [violation(s)].

31 U.S.C. § 3729(a)(1).

40.    For purposes of the FCA, an actionable "claim" includes a claim presented to Medicare or to TRICARE/CHAMPUS for reimbursement. *See id.* § 3729(b)(2).

41.    The FCA defines "knowing" and "knowingly" to include "actual knowledge of," as well as "deliberate ignorance" and "reckless disregard of the truth or falsity of," particular information. *Id.* § 3729(b)(1).

42.     The FCA provides a private right of action that permits relators[2] to maintain an FCA lawsuit, in the name of the United States government, to recover damages arising from a defendant's or defendants' fraud against the United States. *Id.* § 3730(b)(1).

## Factual Background

43.     From in and around the fall of 2012 through at least the winter of 2013, Defendant Hoover, in the course and scope of his agency with Defendant AiBiotech, periodically visited the Lions office to check on cardiac equipment at that facility.

44.     Upon information and belief, Defendant Hoover was able to obtain the insurance subscriber, billing and demographic information of Lions' patients.

45.     Matthew Burkett is a certified registered nurse employed by Greentree Medical and practicing out of the Lions office.

46.     In or around the fall of 2012, Mr. Burkett, at Defendant Hoover's invitation and along with a number of physicians from practices other than Greentree Medical, attended a dinner hosted by Defendant Hoover.

---

[2] The provision in question provides for "Actions by Private Persons." 31 U.S.C. § 3730(b)(1). As applied here, Greentree Medical qualifies as a "person." *See Minn. Ass'n of Nurse Anesthetists v. Alina Health Sys. Corp.*, 276 F.3d 1032, 1048 n. 12 (8th Cir. 2002) ("Neither the 1986 Amendments Act nor a review of its background or legislative history suggests that Congress meant to exclude suits on the basis of whether the relator was a natural person, corporation, or association.") *See also, e.g., Found. for Fair Contracting, Ltd. v. G & M E. Contracting, Inc.*, 259 F. Supp. 2d 329 (D.N.J. 2003) (addressing claims of entity-relator).

47.     At the dinner, Defendant Hoover represented to Mr. Burkett that Defendant Hoover, in the course and scope of his agency with Defendant AiBiotech, was involved in trials of genetic testing that could potentially benefit patients.

48.     Defendant Hoover subsequently spoke to Mr. Burkett and told Mr. Burkett that the genetic tests Defendant Hoover had mentioned at the dinner were part of a clinical research study and would be free of all charge to patients and carriers.

49.     In the same conversation, Defendant Hoover further advised Mr. Burkett that, if Mr. Burkett simply obtained DNA cells from patients by swabbing the inside of patients' cheeks with a cotton swab, and if Mr. Burkett then provided Defendant Hoover with the samples and the patients' signatures on a form consenting to "Noninvasive DNA Test for Drug Sensitivity" evidently supplied by Defendant AiBiotech (the "Order Form"), Defendant Hoover would, free of charge, perform the tests and provide the results thereof to Mr. Burkett. A true and correct copy of an Order Form is attached hereto as Exhibit "A."

50.     Defendant Hoover offered to pay to Mr. Burkett a kickback of fifty dollars ($50) per swab obtained from Lions patients, though Mr. Burkett declined this offer.

51.     When Mr. Burkett inquired of Defendant Hoover whether Mr. Burkett should apply any criterion or set of criteria in selecting which Lions patients to recruit into what Mr. Burkett believed and represented to patients was a free

11

clinical trial, Defendant Hoover responded in essence that Mr. Burkett should "swab everyone who comes through the door."

52.    Based upon the instructions he received from Defendant Hoover, who was at all relevant times acting as an agent of Defendant AiBiotech, Mr. Burkett began to obtain patient consent, swab patients for DNA and submit the forms and DNA to Defendant Hoover to be used for what Mr. Burkett and the patients believed would be free clinical trials.

53.    Neither Mr. Burkett nor any other Greentree Medical employee completed any Order Form, though the Order Form contains extensive blank portions to be completed with information identifying the referring physician and the patient's insurance information. *See* Ex. A.

54.    No other Greentree Medical employee and no physician at Greentree Medical otherwise approved or authorized the testing performed by Defendant AiBiotech. Only Mr. Burkett, believing the tests to be clinical trials free of any charge to Lions' patients, their insurers, and Medicare, requested any tests through Defendant Hoover or from Defendant AiBiotech.

55.    Upon information and belief, Defendant Hoover in fact filled in the Order Forms with the patients' insurance subscriber information, which he obtained under false pretenses.

56.    After Defendants procured the DNA samples and consents from Lions' patients for the purported free medical tests, the Lions patients began to receive benefits statements (EOBs) from their health insurance providers indicating that

12

Defendant AiBiotech was submitting claims to the patients' insurers seeking full payment for the DNA tests in question.

57.     This fact was brought to Greentree Medical's attention when those patients expressed concern over receiving such statements, which showed that the patients' insurers had been charged, and some had paid, thousands of dollars per patient in connection with what patients and Mr. Burkett and the patients had believed, due to Defendants' representations, would be free medical trials.

58.     Beginning in or around December 2012, Lions patients advised Bonnie Smitley, an administrator at Greentree Medical who manages billing as well as patient and staff complaints and office procedures for Lions, that the patients were receiving EOBs from their insurance carriers showing that Defendant AiBiotech was seeking reimbursement for the supposedly "free" and "trial" DNA tests.

59.     The EOBs indicate that Defendant AiBiotech routinely sought payment for the DNA testing performed pursuant to the Order Forms and on the DNA samples procured from Lions' patients and submitted to Defendant Hoover by Mr. Burkett.

60.     The EOBs identify Mr. Burkett, a certified registered nurse, as the requesting "physician."

61.     Upon information and belief, Defendant Hoover knowingly supplied the false information identifying Mr. Burkett as the referring physician on the Order Forms in order to deceive the patients' insurers, including Medicare and

13

TRICARE/CHAMPUS, into thinking that the tests were reasonably necessary for the patients' treatment.

62.     A substantial proportion of the Lions' patients victimized by Defendants' scheme are beneficiaries of federally-funded healthcare programs, and EOBs sent to such patients indicate that on multiple occasions Defendants sought and the United States government paid at least $4,000 per beneficiary for the tests Defendants performed in the course of their fraudulent scheme.

63.     For instance, a "Medicare Summary Notice" from CMS to Lions patient F.M., dated March 28, 2013 and detailing "claims processed on 12/31/2012," indicates that Defendant AiBiotech charged Medicare Part B a total of $11,119.85 for the tests in question, and that Medicare in fact paid to Defendant AiBiotech $4,141.86.

64.     Additionally, Greentree Medical knows of at least one claim submitted by Defendants to TRICARE/CHAMPUS related to the fraudulent tests performed on Lions' patients.

65.     Upon learning that its patients and their insurers were being billed for what the patients and Mr. Burkett believed would be free clinical trials, Greentree Medical, through its Compliance Officer Saurabh Bhatia, wrote two separate letters to Defendant AiBiotech in January 2013 advising Defendant AiBiotech that the tests were not approved and to immediately cease submitting claims for the same.

66.     The first such letter, dated January 11, 2013, states that Mr. Burkett "is a non-physician" who lacks authority to order or approve the testing of Lions'

patients, that the staff and patients of Greentree Medical, and specifically Lions, involved in the unauthorized tests did not believe that the patients or their insurers "would be billed for the tests" but that various Lions patients who participated in the tests nonetheless received correspondence from their insurers "indicating that bills have been submitted relative to these tests." A true and correct copy of this correspondence is attached hereto as Exhibit "B."

67.     The January 11 letter requests that Defendant AiBiotech "immediately STOP performing tests on the specimens taken" from Lions' patients and "STOP billing the patients and/or their insurance companies for the unauthorized testing." Ex. B (emphasis in original).

68.     Further, Greentree Medical requests in the January 11 letter that Defendant AiBiotech provide to Greentree Medical "a complete list of all patients of [Lions] from whom [Defendant AiBiotech had] received specimens for testing." *Id.*

69.     The second letter, dated January 25, 2013, further advises Defendant AiBiotech that Greentree Medical chief physician is unfamiliar with the process and "efficacy of the noninvasive DNA testing" that Defendant AiBiotech was performing related to Lions' patients and that the physician would thus neither approve nor authorize any "past or future testing" by Defendant AiBiotech on Greentree Medical's patients. A true and correct copy of this correspondence is attached hereto as Exhibit "C."

70.     To this end, the January 25 letter again demands that Defendant AiBiotech "immediately stop performing tests on specimens taken from" Lions'

15

patients and "stop billing the patients and/or their insurance companies for the unauthorized testing." Ex. C.

71.    The January 25 letter also reiterates Greentree Medical's previous request that Defendant AiBiotech supply a list of all Lions patients from whom Defendant AiBiotech had "received specimens for testing," and for "the address and name of the person" to contact with further inquiries in this matter. *Id.*

72.    Despite these express warnings from Greentree Medical that the tests were procured under false pretenses and were performed despite lacking the requisite physician authorization and approval, Defendant AiBiotech did not cease submitting bills for such tests, as indicated by EOBs sent to Lions' patients from their insurers dated after January 11, 2013.

73.    For example, Lions patient D.B. received a notice from CMS regarding "claims processed on 1/18/2013" and showing that Defendant AiBiotech charged Medicare Part B a total of $13,439 for the tests in question, and that Medicare approved and paid to Defendant AiBiotech $4,094.38.

74.    Similarly, Lions patient K.G. received a nearly identical notice regarding "claims processed on 1/30/2013" and showing that Defendant AiBiotech charged Medicare Part B a total of $9,076.30 for the tests in question and that Medicare approved $0, such that K.G. might be liable for all of the price billed by Defendant AiBiotech to Medicare.

75.    The EOBs show that Defendants knowingly and intentionally submitted or caused to be submitted to Medicare, in connection with the

fraudulently-induced tests, claims for payment to which Defendants knew they were not entitled.

76.     Specifically, Defendant AiBiotech persisted with its fraudulent scheme in the face of express notification from Greentree Medical's compliance officer that the tests were obtained under false pretenses and were performed without the authorization of a referring or otherwise qualified healthcare professional.

77.     In so doing, Defendant AiBiotech acquiesced in, agreed to and condoned the fraudulent conduct of Defendant Hoover in obtaining the consents and DNA samples from Lions' patients.

78.     Thus, Defendants knowingly and intentionally conspired to and did present or cause to be presented, and make or use false records material to the government's decision to issue reimbursement related to, false claims for payment seeking reimbursement to which Defendants were not, and knew they were not, entitled under the laws and regulations of Medicare and TRICARE/CHAMPUS.

79.     Upon information and belief, and in particular the fact that Defendant Hoover invited physicians from practices other than Greentree Medical to the dinner at which he presented the genetic testing "opportunity," Defendants' scheme further involves or has attempted to involve patients of other physicians and practices.

### Count I: Violation of 31 U.S.C. § 3729(a)(1)(A)

80.     Greentree Medical hereby incorporates the foregoing paragraphs 1 through 79 of this complaint as if fully set forth herein.

81.    Defendants presented or caused to be presented to the United States government, through Medicare and TRICARE/CHAMPUS, claims for payment seeking reimbursement for the DNA tests performed pursuant to Order Forms and DNA samples Defendants fraudulently obtained from Mr. Burkett and from Lions' patients.

82.    The claims were false because, *inter alia*, Defendants sought payment for services that were neither "reasonable" nor "necessary," for purposes of federally-funded healthcare programs, and because the costs for which Defendants sought reimbursement were not "reasonable costs" reimbursable by such programs.

83.    Defendant Hoover acted with knowledge, deliberate ignorance or reckless disregard of the fact that he was presenting or causing the presentment of fraudulent claims to the federal government because, as described above and in particular his instruction to "swab everyone who comes through the door," Defendant Hoover knew and intended that the Order Forms would misrepresent that the tests were reasonable and necessary when in fact the tests were performed indiscriminately and regardless of medical necessity.

84.    Defendant AiBitoech acted with knowledge, deliberate ignorance or reckless disregard of the fact that it was presenting or causing the presentment of fraudulent claims to the federal government, as described above and in particular because Defendant AiBiotech continued to submit claims for the unnecessary tests even after warnings from Greentree Medical that the tests were not reasonable or necessary and were performed without the necessary approval or authorization.

85.     Accordingly, both Defendant AiBiotech and Defendant Hoover are liable for violating the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

### Count II: Violation of 31 U.S.C. § 3729(a)(1)(B)

86.     Greentree Medical hereby incorporates the foregoing paragraphs 1 through 85 of this complaint as if fully set forth herein.

87.     Defendant Hoover made or used a false record or statement material to the decision of the United States, specifically Medicare and TRICARE/CHAMPUS, to issue reimbursement in connection with invoices submitted by Defendant AiBiotech, by adding Lions' patients' insurance information to the Order Forms and falsely indicating that Mr. Burkett had ordered the tests for a proper, medically necessary purpose.

88.     Defendant AiBiotech made or used false records or statements material to the decision of the United States, specifically Medicare and TRICARE/CHAMPUS, to reimburse Defendant AiBiotech's fraudulent claims for payment in connection with the DNA tests by submitting to the federal government the false Order Forms made by Defendant Hoover while he was acting in the course and scope of his agency with Defendant AiBiotech.

89.     The claims were pursuant to false records or statements because, *inter alia*, such claims requested payment for services that were neither "reasonable" nor "necessary" pursuant to applicable federal laws.

90.     Defendant Hoover acted with knowledge, deliberate ignorance or reckless disregard of the fact that he was making or using a false record or

statement material to the decision of the United States to issue reimbursement in connection with the fraudulent invoices because, as described above and in particular his instruction to "swab everyone who comes through the door," Defendant Hoover knew and intended that the Order Forms would misrepresent that the tests were reasonable and necessary when in fact the tests were performed indiscriminately and regardless of medical necessity.

91.     Defendant AiBitoech acted with knowledge, deliberate ignorance or reckless disregard of the fact that it was making or using a false record or statement material to the decision of the United States to issue reimbursement in connection with the fraudulent invoices, as described above and in particular because Defendant AiBiotech continued to submit claims for the unnecessary tests even after warnings from Greentree Medical that the tests were not reasonable, necessary, approved or authorized.

92.     Accordingly, both Defendant AiBiotech and Defendant Hoover are liable for violating the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

### Count III: Violation of 31 U.S.C. § 3729(a)(1)(C)

93.     Greentree Medical hereby incorporates by reference the foregoing paragraphs 1 through 92 of this complaint as if fully set forth herein.

94.     As described above, Defendants agreed to and did conspire to violate the substantive provisions of the False Claims Act by engaging in a scheme to present or cause presentment of false claims to federally-funded healthcare

programs, and to make or use false records or statements material to the government's decision to pay such claims.

95.     Defendant Hoover engaged in a series of overt acts, in the course and scope of his agency with Defendant AiBiotech and in furtherance of Defendants' conspiracy, including but not limited to fraudulently inducing Mr. Burkett to procure from Lions' patients the consents and DNA samples that gave rise to Defendants' false claims.

96.     Defendant AiBiotech engaged in a series of overt acts in furtherance of Defendants' conspiracy, including condoning and agreeing to Defendant Hoover's fraudulent behavior by submitting invoices related to the fraudulently-inducted tests to federally-funded healthcare programs even after being advised by Greentree Medical that Defendants had no right to reimbursement for the same.

97.     Accordingly, both Defendant AiBiotech and Defendant Hoover are liable for violating the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

WHEREFORE, plaintiff-relator Greentree Medical Center, P.C. requests judgment in favor of itself and the United States and against defendants American International Biotech, LLC and Jason Hoover for civil penalties of $5,500 to $11,000 for each false claim of such defendants plus treble damages, pursuant to 31 U.S.C. § 3729(a), for costs of court and pre- and post-judgment interest at the rates permitted by law, and for such other relief as may be appropriate.

Respectfully submitted,

BURNS WHITE LLC

By: /s/ Stephen S. Stallings
  Stephen S. Stallings, Esquire
  Pa. ID No. 205131
  ssstallings@burnswhite.com
  Four Northshore Center
  106 Isabella Street
  Pittsburgh, PA 15212
  Tel.: (412) 995-3000
  Fax: (412) 995-3300

  *Attorneys for Plaintiff-Relator*
  *Greentree Medical Center, P.C.*

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to Federal Rule of Civil Procedure 4(b)(4) and 31 U.S.C. § 3730(b)(2), a copy of the foregoing Sealed Complaint along with a written disclosure of substantially all evidence supporting the averments therein has been served via first-class, postage prepaid United States mail upon the following:

The Honorable David J. Hickton
United States Attorney for the Western District of Pennsylvania
c/o Michael A. Comber
Civil Division Chief
United States Attorney's Office
United States Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

Attorney General of the United States
c/o Stuart F. Delery
Acting Assistant Attorney General for the Civil Division
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

/s/ Stephen S. Stallings
Stephen S. Stallings, Esq.